**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel Bruce BONALLO,
Defendant–Appellant.**

No. 87–3085.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1988.

Decided Oct. 7, 1988.

Charles W. Carnese, Portland, Or., for defendant-appellant.

Lance A. Caldwell, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before WALLACE and REINHARDT, Circuit Judges, and HARDY,* District Judge.

REINHARDT, Circuit Judge:

Defendant/appellant Daniel Bonallo appeals his conviction on 12 counts of bank fraud under 18 U.S.C. § 1344 (1984). The appeal requires us to determine whether a scheme to defraud a bank under that statute requires that the misrepresentation actually precede the bank's transfer of money or property to the perpetrator. We also consider the sufficiency of the indictment as well as the sufficiency of the evidence. Bonallo also contests the admissibility of certain evidence. We affirm his conviction on 11 of the 12 counts.

* Hon. Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation.

## I.  FACTS

Daniel Bonallo worked at American Data Services (American Data) beginning in 1979. American Data is a subsidiary of The Oregon Bank.[1] American Data handles data processing for the Bank as well as for other banks. Bonallo worked in the Systems Development department, the function of which was to correct problems arising in the computer software. He was responsible for support of the Automatic Teller Machines (ATM) and Bank Card Management Systems.

Bank customers use an ATM machine to get cash, if the customer has an appropriately coded plastic card—i.e., a VISA, Mastercard or personal banking card—and a personal identification number (PIN). Once the customer punches in the correct PIN, the ATM allows the customer to withdraw up to $300 in $20 bills per day. Bonallo possessed a Mastercard, a personal banking card, and a PIN.

The ATM communicates the details of a transaction to a Tandem computer at American Data. The Tandem stores this information over a 24–hour cycle. At about 2:00 p.m. each Monday–Friday, this data is transferred to an IBM computer for further storage and report preparation. Thus, it was important that any manipulation of the transaction records be done soon after the transaction, so that the transaction would not be recorded in the IBM computer. The American Data building, which houses the Tandem, has a door security system which logs the entrances and exits of personnel during after hours periods.

During 1985, the Bank received a greater than average number of reports from customers claiming that their accounts reflected ATM withdrawals about which the customers knew nothing. After checking its security procedures, the Bank concluded that the problem was most likely a fraud committed by an American Data employee through manipulation of computer records. Since Bonallo was the most expert employee regarding the ATM system, suspicion focused upon him.

The Bank developed a list of 40 fraudulent transactions. It then limited its consideration of these transactions only to those that took place on a weekend or after hours, times when there would also be a record of entry and exit at the American Data building. Two of the 15 cash withdrawals which occurred during those times apparently involved customers of a different bank. This left 13 transactions which could be linked to weekend or after hours access to the American Data building, for which there would also be a record of entry and exit from the building. One of these transactions was later determined to have been erroneously questioned by the customer; this transaction, the basis of Count 8, was later dismissed on the government's motion. The remaining 12 transactions constitute the offenses of which Bonallo was convicted.

Regarding these transactions, the access logs to the American Data building indicated that Bonallo entered the building shortly after each fraudulent transaction occurred. Nearly all of the transactions occurred at ATM machines between Bonallo's house and the American Data building or at the machine just outside the door of the building. In the case of the latter transactions, the records showed that in each instance Bonallo left the building one minute prior to the withdrawal and re-entered the building two minutes after the funds were obtained. The Federal Bureau of Investigation made a videotape which showed an American Data employee leaving the building, walking to the ATM, withdrawing cash, and returning to the building. The sequence took approximate three minutes, the same time noted on the computer logs for Bonallo on the occasions of the fraudulent transactions.

Kanable, the person who assumed Bonallo's duties after he was fired, testified that he found a "fraud program" in Bonallo's Tandem computer program library. He also stated that the program was designed

---

1. Bonallo contends that he is not a bank employee, and the government does not disagree. For purposes of this opinion, we assume Bonallo's contention to be correct.

to provide access to ATM computer files, and to alter transaction records, although he conceded that it could, conceivably, have been put to a legitimate use.

During the time of the fraudulent transactions, Bonallo made numerous deposits of cash to a savings account, frequently in $20 bills, the denomination that the ATMs dispensed.

Bonallo denies making the withdrawals, claims that he never ran, nor was even aware of, the fraud program and asserts that he was framed by the real culprit, who is otherwise unidentified.

Bonallo was charged with 13 counts of violating 18 U.S.C. § 1344 (1984), the statute that prohibits bank fraud. He waived trial by jury. Following a bench trial, and the government's dismissal of Count 8, the district court found him guilty on the remaining 12 counts. Bonallo timely appeals.

## II. THE SUFFICIENCY OF THE INDICTMENT

■ Bonallo asserts that the indictment is insufficient because it charges a violation of section 1344(a)(2), and the facts alleged do not set forth a violation of that subsection.[2] While he may be correct that the facts alleged do not describe a scheme to obtain bank funds by means of false pretenses under 1344(a)(2), Bonallo errs when

he states that the indictment charges a violation of that subsection. Indeed, the facts alleged in the indictment clearly make out a charge of bank fraud under subsection 1344(a)(1).[3] Bonallo does not even address that charge.

Presumably, Bonallo errs because there is a reference to false pretenses in the prefatory language of the portion of the indictment describing the scheme. Also, the indictment expressly identifies a violation of 18 U.S.C. § 1344, but does not specify whether the charge is based on subsection 1344(a)(1) and/or 1344(a)(2).

When construing the meaning of an indictment, the description of the alleged conduct is far more critical than the indictment's prefatory language or its citation of a particular provision of a statute. Indeed, in some circumstances, a conviction can be sustained on the basis of a statute not expressly charged in the indictment. *See, e.g., United States v. Hutcheson,* 312 U.S. 219, 229, 61 S.Ct. 463, 464, 85 L.Ed. 788 (1941); *Williams v. United States,* 168 U.S. 382, 389, 18 S.Ct. 92, 94, 42 L.Ed. 509 (1897).

An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,

---

**2.** The indictment states in pertinent part:
*Scheme*
5. Beginning in about January, 1985 and continuing to about August, 1985, in Portland, in the State and District of Oregon, DANIEL BRUCE BONALLO, defendant herein, devised a scheme to obtain money which was in the custody and control of The Oregon Bank, a federally insured bank, by false and fraudulent pretenses and representations. It was part of said scheme that;
   a. BONALLO, through his employment duties at ADC [American Data], would discover the computer password needed to gain access to computerized ATM records.
   b. BONALLO would then use an ATM access card to get cash from an Oregon Bank ATM.
   c. After receiving cash, BONALLO would go to ADC and alter computer records to falsely indicate that the cash had been withdrawn by some bank customer other than himself.
6. On or about April 4, 1985, at Lake Oswego, in the State and District of Oregon, DANIEL BRUCE BONALLO, defendant herein, did unlawfully, wilfully and knowingly execute said

scheme by withdrawing $300.00 from The Oregon Bank, Lake Oswego Branch ATM and altering ADC records to falsely indicate that the withdrawal was made by Steve Morris; all in violation of Title 18, United States Code, Section 1344.
The indictment then lists the 12 other occasions upon which Bonallo allegedly executed this scheme, and states that the transactions were all in violation of 18 U.S.C. § 1344.

**3.** 18 U.S.C. § 1344 provides:
   (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice
   (1) to defraud a federally chartered or insured financial institution; or
   (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined no more than $10,000, or imprisoned not more than five years, or both. . . .

and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citations omitted). According to Fed.R.Crim.P. 7(c)(1), "[t]he indictment ... shall be a concise and definite written statement of the essential facts constituting the offense charged." *See also United States v. Buckley,* 689 F.2d 893, 897 (9th Cir.1982). However, error in the citation or its omission shall not be grounds for dismissal of the indictment or reversal of the conviction if the error "did not mislead the defendant to his prejudice." Fed.R.Crim.P. 7(c)(3). We review the sufficiency of an indictment de novo. *United States v. Buckley,* 689 F.2d at 897.

Rather than false pretenses, the indictment charges subsection (a)(1) fraud. It details facts and circumstances that constitute a scheme to defraud a federally chartered bank. *See* discussion Part III.A. *infra.* Because the indictment sets forth the elements of a subsection 1344(a)(1) violation, and because it expressly charges a violation of section 1344, we conclude that it fairly informed Bonallo of the charge against which he was required to defend. *See Hamling v. United States,* 418 U.S. at 117, 94 S.Ct. at 2907. The indictment also enables him to plead double jeopardy in bar of future prosecutions for this same offense. *Id.* Accordingly, the indictment is sufficient.

We observe, however, that the indictment's reference to false pretenses and its failure to specify subsection 1344(a)(1) could well have created at least some degree of initial confusion; "false pretenses" is simply not involved in this case. Indictments should be drawn with greater care. The government should make every effort to avoid using erroneous or misleading prefatory language and should in all cases specify the particular provision or subsection on which the charge is based. By doing so it will ensure that the defendant receives fair warning of the charge against

which he or she must defend and will at the same time avoid unnecessary risks to itself on appeal. While the indictment here fell short of the desired standard, it was, nevertheless, sufficient to fairly inform Bonallo of the charge against him.

▮ In any event, even if the inclusion of the prefatory language regarding false pretenses and the omission of a reference to the particular subsection constituted error, we would not reverse, because the "error" did not mislead Bonallo *to his prejudice* under Fed.R.Crim.P. 7(c)(3). As already indicated, the indictment sets forth the elements of the illegal scheme, and the times and places where the withdrawals occurred. Bonallo therefore knew of the conduct he was being accused of, and could adequately prepare a defense. Indeed, he argued at trial that someone else at American Data was trying to frame him, and that the government's case against him was wholly circumstantial and incomplete—precisely the arguments that he would have made had subsection (a)(1) been expressly charged in the indictment and had the prefatory language been omitted. In view of the defense Bonallo asserted, it is clear that his preparation would have been the same whether the indictment charged a violation of subsection (a)(1), subsection (a)(2), or simply section 1344.[4] Thus, even if we were to conclude that the government erred, we would have to hold, under Fed.R. Crim.P. 7(c)(3), that the error "did not mislead the defendant to his prejudice" and so did not constitute grounds for dismissal of the indictment or reversal of the conviction.

## III. DENIAL OF MOTION FOR JUDGMENT OF ACQUITTAL

Bonallo next argues on several different grounds that the district court erred by not granting his motion for judgment of acquittal. Two of his arguments involve legal issues. We review these arguments de novo. The third relates to the sufficiency of the evidence. Here, we must affirm if,

---

**4.** Similarly, the legal theories underlying Bonallo's motion for judgment of acquittal (*see infra* Part III.A.) were equally applicable whether the

conduct charged constituted a violation of the fraud or the false pretenses subsection of 1344.

**1432**

viewing the evidence in the light most favorable to the government, any rational juror could have found the elements of the crime beyond a reasonable doubt. *U.S. v. Wolf,* 820 F.2d 1499, 1502 (9th Cir.1987).

### A. *Timing of the Misrepresentation*

■■■ Bonallo's two legal arguments rest solely upon his contention that under the bank fraud statute the misrepresentation must actually precede the transfer of money or property to the perpetrator. For purposes of these arguments only, Bonallo concedes that the government has proved each factual allegation set forth in the indictment. He then argues that even if all those factual allegations are true, he should not have been convicted under section 1344 since his conduct did not constitute "defrauding" or "obtaining by false pretenses." Though he still contends that he was convicted only of section 1344(a)(2), in this part of his argument he also argues that his conduct did not violate section 1344(a)(1).[5]

The district court announced that he was convicting Bonallo of a section 1344 offense, and did not specify whether he was referring to subsection (a)(1), subsection (a)(2) or both. However, in his decision and order, the district court repeatedly referred to the "fraud" committed, and never referred to "false pretenses, representations, or promises". We think it clear that the court convicted Bonallo under subsection 1344(a)(1) only. Accordingly, we need not address Bonallo's first legal argument that the alleged conduct does not constitute false pretenses.

Regarding his second argument, that his conduct did not violate 1344(a)(1), Bonallo contends that because the misrepresenta-

tion—i.e., changing the ATM card numbers so that the withdrawal is charged to the account of another bank customer—occurred after, rather than before he withdrew the cash, there can be no scheme to "defraud" the Bank. Under his argument, it is irrelevant that he intended to deceive the Bank and deprive it of its assets. He cites no authority for his novel theory.

We have not previously considered the elements of a violation of the bank fraud statute, and none of the few cases from other courts of appeals that have done so have suggested the existence of such a requirement. *See, e.g., United States v. Blackmon,* 839 F.2d 900 (2d Cir.1988); *United States v. Goldblatt,* 813 F.2d 619 (3d Cir.1987). Bonallo's view also finds no support in the statute's legislative history or in federal decisions defining fraud as used in other statutes.

The legislative history of the bank fraud statute strongly indicates that Congress intended that it have the same broad scope as the mail fraud statute, 18 U.S.C. § 1341 *et seq.* The Senate Report states that the bank fraud statute is "modeled" after that statute. S.Rep. No. 225, 98th Cong., 1st Sess. at 378–79 (1983), *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3519. Like section 1344, the mail and wire fraud provisions in the mail fraud statute apply to any "scheme or artifice to defraud", as well as to "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341 and 1343. Further, the House Judiciary Committee, in considering the proposed bank fraud statute, expressly endorsed the broad reading courts have given the mail and wire fraud provisions.[6] This endorsement, along with the fact that

---

**5.** Bonallo contends that the conduct involved did not constitute a scheme to defraud under subsection 1344(a)(1) only when arguing that the conviction was not supported by sufficient evidence. He did not address the requisites of a subsection (a)(1) violation for purposes of his earlier contention that the indictment was insufficient. *See supra* Part II.

**6.** The Report states:
The Committee, however, is concerned by the history of expansive interpretations of that

language [i.e., "scheme to defraud" in 18 U.S. C. §§ 1341 and 1343] by the courts. The current scope of the wire and mail fraud offenses is clearly greater than that intended by Congress. Although the Committee endorses the current interpretations of the language, it does not anticipate any further expansions.

H.R.Rep. No. 901, 98th Cong., 2nd Sess. 4 (1984).

the bank fraud statute was "modeled" after the mail fraud statute, makes it clear that Congress sought to apply to bank fraud cases the same broad standard used in determining whether a scheme to defraud is covered by the mail fraud statute.

To allege a violation of the wire and mail fraud provisions, we have required only that the government show that there is 1) a scheme to defraud, 2) a use of the mails or wires in furtherance of the scheme, and 3) a specific intent to deceive or defraud. *Schreiber Distributing v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1399–1400 (9th Cir.1986). Under these provisions, fraud refers to "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with intent to deceive (5) with action taken in reliance upon the representation." [7] *United States v. Clevenger*, 733 F.2d 1356, 1358 (9th Cir. 1984) (citations omitted). The mail fraud statute reaches a wide range of fraudulent activity, *see, e.g., McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 2889, 97 L.Ed.2d 292 (1987) (Stevens, J. dissenting); Rakoff, *The Federal Mail Fraud Statute*, 18 Duquesne L.Rev. 772–73 (1980) (mail fraud statute has been characterized as the " 'first line of defense' against virtually every new area of fraud to develop in the United States in the past century . . . ."), although it applies only to frauds relating to money or property. *McNally*, 107 S.Ct. at 2879–82.

Not surprisingly, we have found no cases suggesting that the misrepresentation must actually precede the transfer of money or property to the perpetrator in order to violate the mail fraud statute. Such a timing requirement would contradict the broad reading afforded its provisions. All that is necessary is the existence of a knowing and material misrepresentation designed to deceive, specific intent, and use of the mails or wires in furtherance of the scheme.

Bonallo's view also finds no support in other federal decisions defining fraud under other statutes. For example, the Supreme Court recently stated that "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " *McNally v. United States*, 107 S.Ct. at 2880–81 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)).[8] *See also Pence v. United States*, 316 U.S. 332, 338, 62 S.Ct. 1080, 1083, 89 L.Ed. 1510 (1942) (fraud under government life insurance policy); *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir.1976) ("fraudulent activity" under 14 C.F.R. § 61.59(a)(2)). There is no suggestion in this description that timing is a factor.

Because we find no authority suggesting that the misrepresentation must precede the transfer of money or property

---

**7.** The fifth *Clevenger* element requiring reliance upon the representation is open to serious question. That element was not at issue in that case. More important, both before and after *Clevenger* we have held that in a charge involving mail or wire fraud, it is not necessary to show that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain. *See, e.g., Schreiber Distributing*, 806 F.2d at 1400; *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *United States v. Louderman*, 576 F.2d 1383, 1387 (9th Cir.1978) (wire fraud). Thus, reliance is likely not a necessary requirement under these fraud provisions. All that is required, apparently, other than use of the mails or wires, is the scheme or the plan, intent to defraud, and nothing further. Other courts of appeals have concluded similarly. *See, e.g., United States v.*

*Strong*, 702 F.2d 97, 100 (6th Cir.1983); *United States v. Melton*, 689 F.2d 679, 684 (7th Cir. 1982); *United States v. Anderson*, 447 F.2d 833, 836 (8th Cir.1971), *cert. denied*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *New England Enterprises, Inc. v. United States*, 400 F.2d 58, 72 (1st Cir.1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). Further, in one of the few cases that has considered the bank fraud statute, the Third Circuit stated that the government need not show that the bank incurred a loss. *United States v. Goldblatt*, 813 F.2d 619, 624 (3rd Cir.1987).

**8.** Although *McNally* involved the mail fraud statute, 18 U.S.C. § 1341, *Hammershmidt* involved the scope of the predecessor of 18 U.S.C. § 371, which makes criminal any conspiracy to defraud the United States.

either in fraud cases generally or under subsection 1344(a)(1) specifically, and because we think that Congress contemplated no such requirement, we reject Bonallo's argument.[9]

### B. *Sufficiency of the Evidence*

■ Bonallo's third argument regarding his motion for judgment of acquittal is that the evidence was insufficient to support the conviction. He also argues that the evidence demonstrates that he was framed.

The case against Bonallo is entirely circumstantial, and there is no evidence that indisputably links him to the various accounts to which false transactions were charged. He is correct that there are several other possible explanations for the fraudulent transactions.

Nevertheless, Bonallo concedes that the alteration of computer records at American Data may be "the most likely method by which such transactions occurred ... ", and numerous people testified to that effect. Although other possible explanations may exist, no evidence was introduced in support of any alternative theory, and the record contains ample evidence to warrant the conclusion that alteration of American Data's computer records was the method by which the fraud was committed. Furthermore, Bonallo testified at trial that the frauds were most likely perpetrated by an American Data employee.

Exhibit "20" is a "fraud program" designed to penetrate and alter ATM transaction files.[10] It is likely that Bonallo, as the most expert computer analyst at American Data, had the ability to write such a computer program. The fraud program was found in Bonallo's program library, and

Bonallo had access to the necessary passwords needed to utilize the program.

Exhibits "1" and "3" are also highly telling, especially when viewed in a light most favorable to the government.[11] There is an ATM machine just outside the American Data building. On August 4, 1985, one minute after Bonallo exited the building, there was a $200 fraudulent cash withdrawal. Two minutes later Bonallo entered the building. Twenty minutes later—the time it would take to alter the computer records—Bonallo again left the building. One minute later there was a $200 fraudulent cash withdrawal; two minutes later Bonallo entered the building. Twenty minutes later he again left the American Data building. The FBI's videotape of the time it took a person to perform a card transaction at this ATM and enter and exit the building corresponded precisely to the times recorded for Bonallo. Furthermore, Bonallo invariably entered the building shortly after each withdrawal, something the perpetrator had to do to ensure that the transaction would not be permanently recorded on the IBM computer. Moreover, Bonallo made numerous deposits of cash to a savings account, frequently in $20 bills (the denomination the ATMs dispensed), during the period when fraudulent transactions occurred.

While Bonallo may be correct in suggesting that the computer records of ATM transactions are subject to manipulation and that the door access logs could have been altered by the real culprit in an effort to frame him, the evidence regarding his activities is, nevertheless, compelling. On the other hand, his suggestion that he was framed is entirely speculative. Viewing the evidence in the light most favorable to the government, as we must on review, we

---

9. Bonallo also urges that there has been no showing that the Bank was the intended victim of the misrepresentation; rather, he says, the victims were the Bank customers whose accounts were falsely charged. We find this argument equally unpersuasive. It is common knowledge that banks reimburse the accounts of wrongly charged customers. Thus, when Bonallo falsified the records so that the accounts of other customers would be charged for the withdrawals, he was effectively harming the Bank which was obliged to reimburse those

customers. The misrepresentation was directed toward the Bank, and possibly towards the customers as well.

10. As we discuss in Part V *infra,* the district court did not abuse its discretion when it allowed the government to introduce Exhibit "20".

11. As we discuss in Part IV *infra,* Government Exhibits "1" and "3" are admissible.

find that a reasonable juror could have concluded beyond a reasonable doubt that Bonallo committed the alleged acts. Accordingly, we hold that, with the exception of a single count, Count 12, the district court did not err when it denied Bonallo's motion for judgment of acquittal.

■ With respect to Count 12, Bonallo argues that his conviction must be reversed because Government Exhibit "1" states that bank card number 90–294393 was improperly charged on August 24, 1985, and that the account belonged to Marcy Dietz; at trial, however, Dietz denied that the bank card number belonged to her and refused to testify as to her correct number. Accordingly, Bonallo argues that the government failed to prove the material allegations of that count. In response, the government characterizes its failure of proof as a "technical variance" that did not prejudice Bonallo in any way. As support for this argument, the government cites *United States v. Von Stoll*, 726 F.2d 584 (9th Cir.1984), which upheld a conviction based on an indictment that charged the defendant with taking money from a certain person, even though at trial the evidence showed that the money had been taken from someone else. Here, by contrast, the government failed to prove that bank card number 90–294393 belonged to someone other than Bonallo. Since we agree with Bonallo that the government failed to prove Count 12's material allegations, we reverse his conviction on this count.

## IV. ADMISSIBILITY OF EXHIBITS "1" AND "3"

■ Government Exhibit "1" is a list of persons whose bank card numbers were used to obtain funds from ATMs of the Bank, and who reported to the Bank that they did not use a card for such transactions. The exhibit lists the person's name, account, type of card used, date and time of the transaction, and the amount of money obtained. The information in the exhibit was obtained from customer affidavits and from American Data's computer records.

Government Exhibit "3" is a list reflecting the date and time of the 12 transactions at issue, and also the pertinent times when Bonallo arrived at and left the American Data building after hours. The information in the exhibit comes from American Data computer logs.

The court admitted the exhibits over the objection of counsel. Bonallo challenges the evidence under Fed.R.Evid. 803(6), the business records exception.

We review evidentiary questions such as this for an abuse of discretion. *United States v. Catabran*, 836 F.2d 453, 456 (9th Cir.1988). Computer records are properly admissible as business records under 803(6). *Id.* at 456. Fed.R.Evid. 803(6) allows for the admission of business records when they are: "(1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness." *Id.* at 457 (citing *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir.1985)).

Bonallo argues that the computer data which served as the basis for Exhibits "1" and "3" was not sufficiently trustworthy under 803(6). He contends that proof of untrustworthiness lies in the fact that the government is claiming, as its central theory of the case, that he altered the computer records. Also, Bonallo points out, government witnesses testified that it was in fact possible to alter the transaction records, as well as the access logs of the American Data building. Bonallo does not dispute the admissibility of the exhibits on any ground other than that the computer data on which they were based was untrustworthy.

Bonallo's contention that proof of untrustworthiness may be found in the government's theory that the computer data was altered is entirely without merit. Had the government attempted to introduce into evidence what it contended to be ordinary records, made in the normal course of business, in their original form,

then proof that the records had been altered would indeed tend to show that they were unreliable. Here, however, the government introduced what it contended to be *altered records* precisely to show that they were in fact altered. Thus, the government's theory that Bonallo altered the records is wholly consistent with its characterization of the records and the purpose for which it introduced them. Under these circumstances, the fact that the records reflected the alterations in no way tends to prove that they are untrustworthy.

Bonallo also argues that the records are untrustworthy because it is possible that someone else at American Data altered them in an effort to frame him. However, Bonallo does not provide any evidence to support that theory. The fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness. The mere possibility that the logs may have been altered goes only to the weight of the evidence not its admissibility. *See Catabran*, 836 F.2d at 458. We therefore conclude that the district court did not abuse its discretion in admitting these exhibits.

## V. ADMISSIBILITY OF EXHIBIT "20"

 Government Exhibit "20" is a computer printout in computer language and is referred to as the "fraud program". It was found by Kanable, Bonallo's replacement at American Data, in the Tandem computer program listings "owned" by Bonallo—i.e., in Bonallo's program library. The "fraud program" could alter ATM transaction records to make it appear that a cash withdrawal from an ATM was made by one cardholder when it was in fact made by another. Bonallo argues that the exhibit was irrelevant to the prosecution because the program was run by Kanable once he modified the computer programs and files, Kanable ran the program not on actual files but on "test" files, and the government failed to establish that Kanable's program was the same program Bonallo used to alter the records.

We find these arguments unpersuasive. Because the discovery of the program in Bonallo's program library likely had a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable ... than it would be without the evidence," Fed.R. Evid. 401, the district court did not abuse its discretion when admitting it. Again, Bonallo's criticisms of the evidence go to its weight rather than its admissibility.

For the above reasons, we affirm Bonallo's conviction on 11 counts of bank fraud in violation of 18 U.S.C. § 1344(a)(1).

AFFIRMED AS TO COUNTS 1 THROUGH 11;

REVERSED AS TO COUNT 12