UNITED STATES of America,
Plaintiff–Appellee,

v.

Agnes MARBELLA, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Geronimo AMIGABLE, Defendant–
Appellant.

Nos. 94–10592, 94–10594.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 8, 1995.*

Argued and Submitted Dec. 8, 1995.

Decided Jan. 12, 1996.

---

\* The panel unanimously finds this case suitable for disposition without oral argument. Fed. R.App.P. 34(a);  9th Cir.R. 34–4.

**1510**

Victor S. Palacios, San Francisco, California, for defendant-appellant Marbella.

Laura Schaefer, Law Offices of Robert E. Boyce, San Diego, California, for defendant-appellant Amigable.

Stephen L. Meagher, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: WALLACE and THOMPSON, Circuit Judges, and WILLIAM J. REA, District Judge.**

Opinion by Judge THOMPSON.

DAVID R. THOMPSON, Circuit Judge:

Agnes Marbella appeals her conviction on two counts of mail fraud, in violation of 18 U.S.C. § 1341. Geronimo Amigable appeals his conviction on four counts of mail fraud, in violation of 18 U.S.C. § 1341, and two counts of money laundering, in violation of 18 U.S.C. § 1956.

Both Marbella and Amigable contend the district court erred by refusing to give an entrapment instruction and by imposing time limitations on the cross-examination of two government agents. Marbella also argues the district court erred by excluding certain testimony.

Amigable argues the government failed to produce sufficient evidence to support his conviction on the money laundering counts.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

** The Honorable William J. Rea, United States District Judge for the Central District of Califor-

nia, sitting by designation.

## FACTS

The convictions arise out of an investigation of fraudulent personal injury claims submitted to California insurers. The FBI, in conjunction with other federal and local authorities, conducted an extensive investigation, focusing on inflated medical bills presented to insurers by medical clinics and law firms. The investigation also targeted the use of "cappers," individuals who receive a percentage of a settlement for referring a patient to a medical clinic and/or law firm.

Typically, an undercover agent would pose as an accident victim. An agent posing as a capper would introduce the agent/victim to a medical clinic. The agent/victim would complain of pain but, after a few visits, would inform the clinic he or she could not return for treatments. Several clinics then falsified medical records to represent that the agent/victim had received more treatments than actually provided.

A medical clinic participating in the scam would refer the agent/victim to a law office to make a settlement demand on the insurer. With knowledge of the fraudulent medical records, the law firm would submit the records to the insurer, along with a demand letter. In some instances, a percentage of the settlement would be paid to the agent/capper who brought the agent/victim to the law firm.

The investigation of the Amigable law firm began when Dr. Rolando Bueno and his wife Lamar Bueno, employed by St. Anthony's Medical Clinic, represented to undercover agents that the Amigable law firm paid referrals. Eventually, three undercover agents claiming personal injuries were referred to the Amigable law office. The charges against Marbella and Amigable resulted from fraudulent claims made on behalf of agents/victims Richard Fong and Steve Young.

Investigator Rob Yee, posing as capper Rob Wong, contacted the Amigable firm in March 1991 to refer Agent Richard Hong,

posing as client Fong. Although Fong received only five medical treatments, his medical bills indicated he received treatments during at least fifteen visits. Amigable presented a settlement demand to Aetna Casualty and Surety (Aetna), including a copy of the inflated medical bills.

Aetna originally offered $3,000 in settlement. Adriana Tarver, the Aetna adjuster, and Marbella, Amigable's office administrator, negotiated the settlement of the Fong claim. After Aetna rejected several counteroffers, Marbella informed Tarver that Fong would accept the $3,000 offer. The FBI requested Tarver to delay payment until agents could inform Marbella and Amigable that the medical reports were inflated.

Investigator Yee, posing as capper Wong, then called Marbella to discuss the Fong case. In the course of this conversation, Investigator Yee told Marbella that Fong had received medical treatments on only five occasions, after Marbella stated the medical reports reflected thirty visits. Marbella responded, "Okay."

Approximately one week later, Investigator Yee spoke on the phone with Amigable. After stating the medical reports reflected thirty visits, Investigator Yee told Amigable that Fong only received treatment on five visits. Amigable responded, "Uh-huh."

Pursuant to the FBI's request, Aetna's adjuster Tarver contacted Marbella to verify the accuracy of the medical reports. When Marbella confirmed the reports, Aetna mailed the settlement check to Amigable's law office, and in return was mailed a release. These two mailings formed the basis for counts one and two of the indictment, charging mail fraud against Marbella and Amigable. The jury convicted Amigable on these two counts, but could not reach a unanimous verdict with respect to Marbella.

The second case focused on a claim made on behalf of agent/victim Young. Agent Tim Louie, posing as prior client Fong and now a capper, introduced Investigator John Auvinen, posing as client Young, to Amigable. Young, who had been treated by Dr. Appolo-

nia Dimapilis, received medical bills representing that he had visited the clinic twenty times. Young, however, had only visited the clinic five times.

In his initial telephone call to Amigable about Young, Agent Louie told Amigable that Young had visited the clinic only four or five times, but the bills reflected twenty visits. Amigable responded, "Uh-huh." Later that same day, Agent Louie met personally with Marbella and Amigable, and again stated that Young had visited the clinic only five times, but the medical reports reflected twenty visits. Agent Louie stated the clinic "helped [Young] out" because Young was looking for a job.

Agent Louie and Amigable then discussed payments for referrals. Amigable said he would give Agent Louie one-third of his fee from the settlement proceeds, but warned Agent Louie that Amigable was not supposed to speak about such payments.

Amigable then sent a settlement demand letter to Fireman's Fund Insurance Company. The amount of this settlement demand included medical bills for Young's inflated visits to the clinic. This mailing was the basis for count three of the indictment, charging mail fraud. The jury convicted Marbella and Amigable on this count.

Fireman's Fund agreed to settle the claim and mailed a check for $4,350 to Amigable. This mailing was the basis for count four of the indictment, charging mail fraud. The jury convicted both Marbella and Amigable on this count.

Later, Investigator Yee, posing as capper Wong, and Agent Louie met with Marbella and Paul Ragasa at Amigable's law office. Ragasa gave Investigator Yee and Agent Louie checks for the referrals.[1] The checks were drawn on an account of the Ragasa Financial Corporation. Ragasa explained that the transactions were initiated by Marbella and that Amigable was not involved in the payments because Amigable "doesn't want to involve himself." Ragasa then explained the payment of referral fees "is not legal in California." The payment of these

---

1. Ragasa testified he lent money to Amigable, through the Ragasa Financial Corporation, for the operating expenses of the law firm, in exchange for a promissory note from Amigable.

two referral fees was the basis for the two money laundering counts, charged only against Amigable. The jury convicted Amigable on both counts.

At trial, Marbella and Amigable testified they believed the Fong case settled on the basis of only five medical visits. They also testified Marbella verified the number of medical visits for the Young claim with Dr. Dimapilis and they determined the medical reports were not inflated. Finally, Amigable testified that, although he initially agreed to pay the referral fees, he later changed his mind because his wife informed him the payments would be unethical. He testified that he then instructed his staff not to pay any referral fees and that he was unaware Ragasa paid the referral fees to Investigator Yee and Agent Louie.

The jury returned its guilty verdicts, and these appeals followed.

## DISCUSSION

### A. Entrapment Instruction

Both Marbella and Amigable contend the district court erred by refusing to give an entrapment instruction. The district court declined to give the instruction because it was inconsistent with Amigable's defense that he was unaware of the mail fraud. The court also declined to give the instruction because the evidence did not support an entrapment defense.

Although an entrapment instruction would have been inconsistent with Amigable's defense of lack of knowledge, he would have been entitled to the instruction if it was sufficiently supported by the evidence. *Mathews v. United States*, 485 U.S. 58, 62, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Simas*, 937 F.2d 459, 462 (9th Cir.1991).

A defendant need only present "slight" evidence on two factors to be entitled to an entrapment instruction: "(1) a government agent induced him or her to commit an illegal act that (2) he or she was not predisposed to commit." *United States v. Sotelo–Murillo*, 887 F.2d 176, 179 (9th Cir.1989). Because it is clear that neither Amigable nor

Marbella presented sufficient evidence to establish lack of predisposition, we address only that factor.

In determining whether a defendant presented sufficient evidence of a lack of predisposition, we review five factors:

[1] the character or reputation of the defendant, including any prior criminal record; [2] whether the suggestion of the criminal activity was initially made by the Government; [3] whether the defendant was engaged in the criminal activity for profit; [4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and [5] the nature of the inducement or persuasion supplied by the Government.

*Id.* at 181 (citation omitted). The absence or presence of reluctance is the most important factor. *Id.*

Marbella and Amigable did not express any concern after the agents informed them the medical bills were inflated for the Fong and Young cases. Marbella did not respond, and Amigable simply responded, "Uh-huh." Neither made any attempt to notify Aetna after learning they had submitted fraudulent medical bills in the Fong case. Further, after learning the medical bills were inflated in the Young case, Marbella and Amigable sent the medical bills to the insurer along with a demand letter. At no time did Marbella or Amigable exhibit any reluctance or hesitation in pursuing settlements based on the fraudulent medical bills.

Further, there is no evidence the agents suggested to Marbella or Amigable that they should submit the fraudulent medical bills to the insurers. The agents merely informed Marbella and Amigable that the bills were false. Marbella and Amigable made the decision to submit the bills anyway. Moreover, although the agents may have first raised the issue of referral fees, they contacted the Amigable law firm only after the Buenos informed them the firm was willing to pay referral fees. Finally, the agents did not pressure Marbella or Amigable and did not attempt to persuade them to engage in the fraudulent activity.

The only factor weighing in favor of Marbella and Amigable is their lack of any criminal record. However, because the other factors clearly weigh against them, we conclude they did not present sufficient evidence of a lack of predisposition to warrant an entrapment instruction.

## B. Exclusion of Ragasa's Testimony

Marbella argues the district court erred by excluding Ragasa's proposed testimony that Liguya Doan[2] told him the agents were "gangsters." Marbella sought to introduce this statement to prove Ragasa paid the agents the referral fees because he was afraid of them. The district court excluded the statement because the court found it to be irrelevant. We agree.

■ Ragasa's alleged fear is not relevant to whether Marbella participated in mail fraud. Marbella had committed the mail fraud before Doan told Ragasa the agents were gangsters. Marbella was not charged with criminal activity in relation to the payment of the fees. The district court did not err by excluding the statement.

## C. Time Limitations on Cross–Examination

Marbella and Amigable both argue the district court violated their confrontation rights by imposing a time limit on the cross-examination of Investigator Yee and Agent Louie. After Amigable's counsel had used a substantial amount of time for cross-examination, the district court restricted further cross-examination to one-half hour per agent.

■ We review de novo whether the limitation on cross-examination violated Marbella's or Amigable's right of confrontation. *United States v. Jones,* 982 F.2d 380, 383 (9th Cir.1992). The district court, however, has considerable discretion in restricting cross-examination. *United States v. Jenkins,* 884 F.2d 433, 435 (9th Cir.), *cert. denied,* 493 U.S. 1005, 110 S.Ct. 568, 107 L.Ed.2d 562 (1989). A restriction imposed on cross-examination "does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant." *United States v. Shabani,* 48 F.3d 401, 403 (9th Cir.1995).

■ The district court did not impose any time limitations upon the cross-examination by Marbella's counsel. Marbella has not identified any questions the court prohibited her from asking or how the time limitation otherwise prejudiced her. Her confrontation challenge fails.

Amigable filed two statements explaining the areas he would have explored absent the time limitation. With regard to Agent Louie, Amigable would have explored "more fully" particular phone calls and meetings. With regard to Investigator Yee, Amigable would have asked him why the agents' questions and Amigable's responses were vague and furtive, further questions about a certain transcript, and about unspecified declarations of good faith and fair dealing made by Marbella and Ragasa.

■ Amigable does not explain why he would have pursued these areas. Nor does he identify what exculpatory evidence the questioning would have produced or how his inability to ask the questions resulted in prejudice. The district court found that Amigable's counsel already had demonstrated the agents lacked a clear recollection of their communications with Marbella and Amigable and that further examination would be unproductive. The record indicates the jury had "sufficient information to appraise the biases and motivations" of the agents. *United States v. McClintock,* 748 F.2d 1278, 1290 (9th Cir.1984) (citation omitted), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). We conclude the time limitations on cross-examination did not violate Amigable's right of confrontation.

## D. Money Laundering

### 1. Sufficiency of the Evidence

Amigable next argues the government did not introduce sufficient evidence to support his conviction for money laundering, in violation of 18 U.S.C. § 1956. Amigable's money laundering conviction was predicated upon

---

**2.** Doan was Amigable's former office administrator. The mail fraud count charged in the indictment was not tried against Doan because Doan is a fugitive.

the use of the Ragasa Financial Corporation bank account to pay the cappers referral fees from the illegally obtained settlement proceeds.

■ We review the evidence in the light most favorable to the government to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Vgeri*, 51 F.3d 876, 879 (9th Cir.1995). We conclude the government's proof was sufficient.

■ To support a conviction for money laundering under 18 U.S.C. § 1956(a)(1), the government must prove Amigable (1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds.[3] *See United States v. Garcia*, 37 F.3d 1359, 1364 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995); *United States v. Baker*, 63 F.3d 1478, 1494–95 (9th Cir.1995).

■ The government presented sufficient evidence that Amigable engaged in a financial transaction which involved proceeds derived from illegal activity. As discussed more fully below, the settlement of fraudulent claims by use of the United States mail generated proceeds which triggered payment of the referral fees.

The government also presented sufficient evidence that Amigable was aware and agreed that a certain percentage of the settlement proceeds would be paid to the agents as a referral fee. The evidence established that a portion of the illegally obtained settlement proceeds was deposited into the Ragasa Financial Corporation bank account and Amigable caused that account to be used to fund the referral fee payments to the cappers.

The referral fee payment scheme promoted the underlying mail fraud activity by encouraging future cases from cappers. The scheme also promoted the underlying fraud by concealing the use of cappers from the insurers. The government presented evidence that insurers consider the use of cappers as indicative of fraudulent claim inflation. By concealing the use of cappers, Amigable avoided heightened scrutiny of claims by the insurers.

Amigable argues the evidence did not establish that he paid the referral fees to acquire cases with inflated medical reports. He argues he paid the fees to obtain only legitimate cases. This argument is meritless. The evidence showed that Amigable paid cappers who brought him cases with medical bills he knew were inflated, and he obtained settlements based on those bills. The jury easily could have inferred he was paying cappers for bringing him phony cases.

Amigable also argues the government's proof was legally insufficient because the government was required to prove Amigable's intent was to conceal the source of the proceeds. This argument is contrary to Ninth Circuit precedent. *Baker*, 63 F.3d at 1495. Section 1956(a)(1) describes the *mens rea* elements of money laundering in the disjunctive. *Id.* The government established Amigable paid the fees to promote the underlying illegal activity. The government need not also prove Amigable paid the fees to conceal the nature or source of the illegal proceeds. *Id.*

---

**3.** In pertinent part, section 1956(a)(1) provides: Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

   (A)(i) with the intent to promote the carrying on of specified unlawful activity; or

   .     .     .     .     .

   (B) knowing that the transaction is designed in whole or in part—

   (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; ...

   .     .     .     .     .

shall be sentenced....

## 2. Exclusion of Tracing Evidence⌐

Amigable argues the district court erred by precluding him from cross-examining a bank representative to establish that the funds paid to the cappers for the referrals were not the actual dollars acquired from the mail fraud. The district court determined this proffered evidence was irrelevant because under section 1956(a)(1) the government need only prove that tainted funds were commingled in an account and, at some point, funds from that account were used to pay the referral fees.

■■■■■ Our standard of review depends upon whether this evidentiary issue presents predominately factual or legal questions. *United States v. Owens,* 789 F.2d 750, 753 (9th Cir.1986), *rev'd on other grounds,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). In *Owens,* we set forth the applicable analysis:

> Questions of the admissibility of evidence which involve factual determinations, rather than questions of law, are reviewed for an abuse of discretion. When a mixed question of law and fact is presented, the standard of review turns on whether factual matters or legal matters predominate. If an "essentially factual" inquiry is present, or if the exercise of the district court's discretion is determinative, then we give deference to the decision of the district court; otherwise, we conduct a *de novo* review.

*Id.* (citation omitted).

■■■■ To resolve the evidentiary issue whether Amigable's tracing evidence is relevant to his defense, we must interpret section 1956(a)(1) of the money laundering statute. Specifically, we have to decide whether this statute requires the government to prove the financial transaction of issuing the checks from the Ragasa Financial Corporation account involved actual tainted dollars or whether the statute is satisfied by showing the tainted dollars were commingled in that account and funds from the account were used to make the payments. Because this is primarily a legal question of statutory interpretation, we apply the de novo standard of review. *See United States v. Jackson,* 935 F.2d 832, 839 (7th Cir.1991); *cf. United States v. Thompson,* 37 F.3d 450, 452 (9th Cir.1994).

A representative of the bank testified the Fong and Young settlement checks were deposited in Amigable's client trust account in October 1991. In November 1991, funds were drawn from this trust account and deposited into Amigable's operating account. Funds from this operating account were then deposited into the Ragasa Financial Corporation account. Shortly after this last transfer, the two referral fees were paid using checks drawn on the Ragasa Financial Corporation account. Both of these checks referenced the Fong and Young cases.

Amigable contends his proffered evidence would show that it was factually impossible that the funds used to pay the referral fees were proceeds derived from the mail fraud because the Ragasa Financial Corporation account reached a zero balance after proceeds from the mail fraud were deposited in the account and before the checks for the referral fees were written. Therefore, Amigable argues, there were no tainted funds in the Ragasa account at the time the referral fee checks were actually issued.

Amigable's argument is predicated upon the assumption that the government must demonstrate the financial transaction of issuing the referral checks involved at least some of the very dollars illegally acquired. We addressed a similar contention in *United States v. Garcia.* In *Garcia,* the defendant argued the government had to prove that all the money used in the financial transaction was from the illegal activity and that the financial transaction did not involve any untainted funds from a commingled account. *Garcia,* 37 F.3d at 1364. We rejected this argument and concluded that "under the money laundering statutes, due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds." *Id.* at 1365.

We reasoned a rule requiring the government to segregate tainted from untainted funds would defeat the purposes of the money laundering statute. *Id.* Such a rule would permit individuals to avoid prosecution

simply by commingling funds, *id.* (quoting *United States v. Johnson,* 971 F.2d 562, 570 (10th Cir.1992)); or in the present case, simply by disbursing the illegally obtained funds from the Ragasa Financial Corporation account, depositing clean funds into that account, and then using the clean money to complete the referral fee transaction. This is a classic example of money laundering.

■ We conclude the government did not have to establish that the proceeds used in the financial transaction to pay the referral fees were part of the actual dollars obtained from the illegal activity. The government established a direct relationship between the illegally acquired settlement proceeds and the subsequent payment of the referral fees. Amigable designated a portion of the proceeds for payment of the referral fees. The government need not prove the account used to pay the fees maintained a positive balance between the time the illegal proceeds were deposited and when the referral fees were paid.[4] A contrary rule would permit laundering the proceeds of an unlawful activity through a bank account by the simple expedient of flushing the account with clean money as an intermediary step in the money laundering cycle. This is the kind of activity Congress targeted in enacting the money laundering statute. *See United States v. Savage,* 67 F.3d 1435, 1441 (9th Cir.1995).

AFFIRMED.

---

**4.** The term "in fact" in subsection 1956(a)(1) does not require evidence of tracing. This language distinguishes the sting situation in subsection 1956(a)(3), in which proceeds used in the financial transaction are not tainted but are government property. *Cf. United States v. Manarite,* 44 F.3d 1407, 1414 n. 10 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995).