UNITED STATES of America, Plaintiff–Appellee,

v.

Robert PANARO, Defendant–Appellant.

United States of America, Plaintiff–Appellee,

v.

Stephen Cino, Defendant–Appellant.

The appellant Cino's petition for rehearing is granted.

Nos. 99–10446, 99–10450.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 2000

Filed Feb. 28, 2001

Amended Sept. 24, 2001

David Z. Chesnoff, Goodman, Chesnoff & Keach, Las Vegas, Nevada; John Fadgen, Las Vegas, Nevada, for the defendants-appellants.

Eric Johnson and Cynthia Shepherd, Asst. U.S. Attorneys, Las Vegas, Nevada, for the plaintiff-appellee.

Before: DAVID R. THOMPSON, O'SCANNLAIN, and TASHIMA, Circuit Judges.

ORDER AND AMENDED OPINION

DAVID R. THOMPSON, Circuit Judge:

## ORDER

The court has heretofore denied the appellant Panaro's petition for rehearing. The mandate in his case, No. 99–10446, is recalled.

The opinion filed February 28, 2001, and published at 241 F.3d 1104 (9th Cir.2001) is amended as follows:

At 241 F.3d at 1107, the last sentence of the first paragraph of the opinion is deleted, and the following is inserted in its place:

We have jurisdiction under 28 U.S.C. § 1291 (1994). We affirm Panaro's conviction and sentence. We also affirm Cino's extortion convictions and one of his two money laundering convictions; we reverse the other money laundering conviction, and remand Cino's case to the district court for resentencing in light of that reversal.

At 241 F.3d at 1109, the last sentence of the penultimate paragraph under Part I.A. is deleted, and the following is inserted in its place:

Under section 1951(b)(2) of the Hobbs Act, "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The evidence shows that DeLuca, Cino, Panaro, and Branco conspired to "obtain[ ] . . . property from" Blitzstein, *viz.*, his interests in the auto shop and loansharking business, through the use or threat of force or fear.

The four conspirators sought not only to put Blitzstein out of business, but actually to get his business interests for themselves. That is important with regard to the "obtaining" element of the Hobbs Act. Of course, "it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom. The Hobbs Act does not require such proof." *United States v. Provenzano*, 334 F.2d 678, 686 (3d Cir.1964); *see also United States v. Hyde*, 448 F.2d 815, 843 (5th Cir.1971) ("One need receive no personal benefit to be guilty of extortion. . . ."). But under the Hobbs Act, extortion, which is a larceny-type offense, does not occur when a victim is merely forced to part with property. Rather, there must be an "obtaining": someone—either the extortioner or a third person—must receive the property of which the victim is deprived. *See Provenzano*, 334 F.2d at 686 ("It is enough that payments were made at the extortioner's direction to a person named by him."); *cf. United States v. Nedley*, 255 F.2d 350 (3d Cir.1958) (finding allegation that defendant tried to put victim out of business insufficient to show "obtaining" for purposes of "robbery" under the Hobbs Act). *See generally* Brian J. Murray, Note, *Protesters, Extortion, and Coercion: Preventing RICO From Chilling First Amendment Freedoms*, 75 Notre Dame L.Rev. 691, 704–712 (1999) (tracing extortion from the common law through the Hobbs Act and concluding that extortionate "obtaining" requires not only that a victim be deprived of property, but also that someone get the property as a result of the deprivation).

At 241 F.3d at 1109, the second sentence under Part I.C. is amended to read: This payment was to compensate Cino for his help in arranging a $25,000 counterfeit travelers' checks transaction.

At 241 F.3d at 1110, the final three paragraphs under Part I. C., denoted by headnotes [4], [5], [6] & [7], are deleted and the following is inserted in their place:

With regard to count 27, we are not persuaded by Cino's arguments. The $1,000 tribute payment was made to facilitate the carrying on of the underlying illegal activity. *See United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996) (scheme to pay referral fees to "cappers" out of illegally obtained settlement proceeds promoted the underlying fraud because it encouraged the cappers to refer future cases). A reasonable jury could have found that the $1,000 tribute payment to Cino promoted the $25,000 counterfeit travelers' checks transaction, because without that tribute payment, Cino would not have permitted the fraudulent scheme to continue.

The evidence was also sufficient for a reasonable jury to find that by accepting the $1,000 tribute payment, Cino engaged in "a financial transaction involving property represented to be the proceeds of specified unlawful activity."

*See* 18 U.S.C. § 1956(a)(3). A financial transaction includes a " 'transfer, delivery, or other disposition' of money." *United States v. Gough*, 152 F.3d 1172, 1173 (9th Cir.1998) (quoting 18 U.S.C. § 1956(c)(3)). Cino engaged in a financial transaction when he accepted the $1,000 tribute payment. The payment also represented "proceeds of specified unlawful activity." Branco, the coconspirator-turned-government-informant, testified that after the completion of the purchase of the $25,000 in travelers' checks, he had an obligation to give Cino "a cut." As Branco testified,

Q. Mr. Branco, with the completion of the purchase of the twenty-five thousand dollars ($25,000) in counterfeit traveler's checks, did you have any obligation toward defendant Steve Cino?

A. Yes.

Q. And what obligation did you have?

A. He would get a cut, an even cut, from—between me and the agent, and the other half—part would go to him.

Q. And why was he entitled to a cut?

A. Because he more—he put it [the transaction] together by that meeting that we had over in Palm Springs. He got it where he put us right back into being able to purchase those [traveller's checks] from that fella. . . .

To fulfill his obligation to give Cino "a cut," Branco arranged to have the $1,000 sent to Cino. In a subsequent phone call with Cino, Branco told him that he had "sent [Cino] out that news clipping"— referring to Cino's "end of the money." Cino confirmed during a phone conver-

sation with Branco that he had received the money.

We have observed that "To establish a violation of [18 U.S.C. § 1956(a)(3)(C) ], the government need not show that the law enforcement officers explicitly stated that the cash in question was the direct product of unlawful activity." *United States v. Nelson*, 66 F.3d 1036, 1041 (9th Cir.1995). "To require government agents to be so specific would make it difficult for undercover agents to enforce § 1956(a)(3)(C), as real criminals would be unlikely to state explicitly the source of their funds." *Id.* In the present case, the evidence makes clear that Cino was receiving the $1,000 as recompense for setting up the meeting that enabled the counterfeit travelers' checks transaction to take place. Moreover, Cino wasn't just getting some amount of money, he was getting "a cut" of the proceeds from the specific scheme.

As to count 33, however, the evidence was not sufficient to establish that the $2,000 payment to Caci "represent[ed] the proceeds of specified unlawful activity," as required by 18 U.S.C. § 1956(a)(3).[1] The government's theory was that Cino aided and abetted the $2,000 tribute payment to Caci, and just like the $1,000 tribute payment to Cino, the $25,000 counterfeit travelers' checks scheme could not have been consummated without Caci's blessing as well as Cino's. The only evidence, however, that the $2,000 payment "represent[ed] the proceeds of some form of unlawful activity" was Branco's testimony that after making arrangements with Caci concerning the scheme, Branco had an obli-

---

1. Cino was charged in count 33 with violating 18 U.S.C. § 1956(a)(1), not 18 U.S.C. § 1956(a)(3). He argues that this mis-citation to the statute compels us to reverse his conviction on count 33. We do not reach this argument because we reverse the count 33 conviction on other grounds.

gation "to send—we owed him [Caci] anything that was going to come up"; and Branco's further testimony that thereafter he directed the undercover agent to send $2,000 to Caci for his assistance. A rational jury could not, from this evidence, find beyond a reasonable doubt that the $2,000 payment to Caci represented proceeds of specified unlawful activity.

At 241 F.3d 1114, the last sentence of Part IV, which sentence begins "His money laundering . . .", the citation following that sentence, and the final word of the opinion, "AFFIRMED," are deleted and the following is inserted in their place:

> His extortion convictions and the money laundering conviction which we affirm each carried a statutory maximum of twenty years imprisonment. *See* 18 U.S.C. §§ 1951(a) & 1956(a)(3).

## V.

We affirm Panaro's and Cino's convictions for conspiracy to interfere with interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a). We also affirm Panaro's sentence.

We affirm Cino's conviction on count 27, money laundering in violation of 18 U.S.C. § 1956(a)(3). We reverse Cino's conviction on count 33 for a similar money laundering violation. In view of our reversal of Cino's conviction on count 33, we vacate his sentence and remand his case to the district court for resentencing.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

In view of the foregoing amendments, all parties, including both appellants Panaro and Cino, may, if they wish, file new petitions for rehearing and for rehearing en banc with regard to the amended opinion filed with this order.

## OPINION

Appellants Robert Panaro and Stephen Cino, both having ties to organized crime families, were charged with various criminal acts, including crimes related to the murder and extortion of Herbie Blitzstein, a person also associated with organized crime. Relevant to this appeal, Panaro was convicted of one count of conspiracy to interfere with interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Cino was convicted of two counts of conspiracy to interfere with interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a) and two counts of money laundering, in violation of 18 U.S.C. § 1956. Both Panaro and Cino appeal their convictions and sentences. We have jurisdiction under 28 U.S.C. § 1291 (1994). We affirm Panaro's conviction and sentence. We also affirm Cino's extortion convictions and one of his two money laundering convictions; we reverse the other money laundering conviction, and remand Cino's case to the district court for resentencing in light of that reversal.

## FACTS

Panaro and Cino, along with fourteen co-defendants, were charged in a fifty-count indictment with various racketeering related charges, including murder, conspiracy to commit extortion, money laundering, counterfeiting, wire fraud, and mail fraud. At trial, Joseph DeLuca, one of the co-defendants, testified that he met Blitzstein in 1991. Blitzstein, a "gangster" with ties to the Chicago La Cosa Nostra ("LCN"), gave DeLuca $25,000 to set up

Any Auto Repair in Las Vegas, Nevada.[1] The business included repairing, buying and selling cars. DeLuca testified that he often bought auto parts for this business from outside the state of Nevada.

According to DeLuca, he would give cash from the business to Blitzstein, who would in turn lend the money out on the street at high interest rates in loanshark or shylock loans. At least one of Blitzstein's borrowers resided outside Nevada. DeLuca testified that he and Blitzstein split evenly all the proceeds from the auto shop business and the loansharking enterprise.

In late 1995, Blitzstein introduced DeLuca to Peter Caruso, who had ties to the Buffalo, Chicago, and Los Angeles crime families. In the fall of 1996, Caruso told DeLuca that DeLuca was being cheated by Blitzstein. Caruso also told DeLuca that he intended to steal Blitzstein's share of the auto shop and loansharking businesses and asked for DeLuca's help. At that time, DeLuca was reluctant, and told Caruso he would not get involved without the advice and consent of co-defendant Panaro. DeLuca testified that he trusted Panaro to protect him because of their prior business relationship and because Panaro was a "made" man in the mafia.

In a meeting shortly thereafter between DeLuca, Panaro, and Caruso, Panaro expressed his intention to take over Blitzstein's share of the loansharking enterprise. Panaro told DeLuca he could have all of the auto shop business and half of the outstanding shylock loans. Caruso said they were going to rob Blitzstein's house and that "if something happened to him, oh well." DeLuca understood this to mean that Blitzstein was going to be killed.

DeLuca testified that soon after this meeting, Panaro told him that Caruso did not have the authority to kill Blitzstein without permission from New York. Panaro said he was going to have to check with co-defendant Cino, an LCN soldier, about the murder/extortion plan.

John Branco, a co-defendant turned government informant, testified that he met with Panaro and Cino in December 1996. At this time, Panaro and Cino asked Branco to tell Caruso not to kill Blitzstein. Panaro said that after the first of the year, they would confront Blitzstein and tell him "It's all over for you. Don't bring your fuckin' face in this fuckin' garage ever again." Later that day, Branco passed on Panaro and Cino's message to Caruso.

DeLuca testified that Panaro called him on January 4, 1997 and set up a meeting at a Denny's Restaurant. DeLuca and Panaro were the first to arrive. While they were waiting for the others, DeLuca told Panaro that Caruso was prepared to proceed with the burglary and murder during the first week of January 1997. Panaro agreed to Caruso's plan. After Cino, Branco, and Caruso arrived, Panaro whispered to Cino and DeLuca whispered to Branco that Caruso was planning to kill Blitzstein during the burglary. Branco expressed concern and said they should just focus on forcing Blitzstein out of the business. For the rest of the meeting, the conspirators discussed their plan to force Blitzstein to give up his interests in the auto shop and loansharking businesses. Panaro, Cino, and Branco agreed to accompany DeLuca to meet with Blitzstein at the auto shop. DeLuca testified that everyone present was to benefit from the extortion and the robbery.

---

1. It is unclear whether this money was a loan or a contribution to the capital of the business.

The day after this January 4 meeting, DeLuca told Panaro he had reservations about the plans to rob and kill Blitzstein, and that he was afraid of Branco. Panaro responded that he would take care of Branco and that "if something was going to happen to [Blitzstein], oh well." On January 6, Caruso called DeLuca and told him "[t]hat thing . . . that needed to be done is done." DeLuca testified that he understood this to mean that the burglary and murder of Blitzstein had been accomplished. Blitzstein's dead body was discovered on January 7. The coroner determined that Blitzstein had been killed the evening of January 6.

Alfred Maruiello pleaded guilty to charges related to Blitzstein's murder. Maruiello admitted to being hired by Caruso to kill Blitzstein. After Blitzstein's death, Panaro asked DeLuca to compile a list of the outstanding shylock loans and share that information with Branco. As instructed, DeLuca gave the list, with loans totaling approximately $247,000, to Branco. Panaro, Cino, and Branco agreed to divide the proceeds from the loansharking business. In addition, they agreed they would get DeLuca to pay them a regular amount of money for the privilege of operating the auto shop. Not long thereafter, the defendants were arrested. They were tried, convicted and sentenced, and these appeals followed.

## ANALYSIS

### I.

#### A. *Extortion of Blitzstein*

■ Panaro and Cino argue the evidence was insufficient to support their convictions for the Blitzstein extortion conspiracy. They contend there was no communication of any threat to Blitzstein. Indeed, he was murdered before being confronted by the conspirators. Panaro and Cino further argue the government failed to present evidence to show a nexus between Blitzstein's planned extortion and interstate commerce.

Having reviewed the record, we conclude the evidence was sufficient to support the convictions of Panaro and Cino for conspiracy to extort property from Blitzstein. During the January 4, 1997 meeting, Panaro and Cino made repeated reference to their intention to implicitly threaten Blitzstein with violence to force him to give up his interests in the auto shop and loansharking businesses. After discussing DeLuca's fear that Blitzstein would retaliate against him for forcing Blitzstein out of the businesses, Panaro said "[y]ou wanted him shut up, so we're here to shut him up" and "we're here to protect you." Panaro also said "he's going to see us there, he knows, he knows he's history." If Blitzstein refused to forfeit his interest in the businesses, Panaro explained Branco would "pick him up bodily" and throw him out of the building. Panaro said, referring to Blitzstein, "[h]e ain't gonna say nothing. Just throw him out. He see us all sittin' there." Branco followed up with "[h]e'll know why we are here."

At trial, Branco testified as a witness for the government. He said that having himself, Cino, and Panaro present at the planned meeting when Blitzstein was to be kicked out of the businesses was significant because it "would be enough to let [Blitzstein] known that these are members of the mafia and if he doesn't leave he's going to have problems from other people too." Branco testified that he, Cino, Panaro, and DeLuca were each to share in Blitzstein's businesses. Viewing the evidence in the light most favorable to the government, we conclude a reasonable jury could have found Panaro and Cino guilty of conspiracy to extort property from Blitz-

stein in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

Under section 1951(b)(2) of the Hobbs Act, "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The evidence shows that DeLuca, Cino, Panaro, and Branco conspired to "obtain[ ] ... property from" Blitzstein, *viz.*, his interests in the auto shop and loansharking business, through the use or threat of force or fear.

■ The four conspirators sought not only to put Blitzstein out of business, but actually to get his business interests for themselves. That is important with regard to the "obtaining" element of the Hobbs Act. Of course, "it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom. The Hobbs Act does not require such proof." *United States v. Provenzano*, 334 F.2d 678, 686 (3d Cir.1964); *see also United States v. Hyde*, 448 F.2d 815, 843 (5th Cir.1971) ("One need receive no personal benefit to be guilty of extortion...." ). But under the Hobbs Act, extortion, which is a larceny-type offense, does not occur when a victim is merely forced to part with property. Rather, there must be an "obtaining": someone—either the extortioner or a third person—must receive the property of which the victim is deprived. *See Provenzano*, 334 F.2d at 686 ("It is enough that payments were made at the extortioner's direction to a person named by him."); *cf. United States v. Nedley*, 255 F.2d 350 (3d Cir.1958) (finding allegation that defendant tried to put victim out of business insufficient to show "obtaining" for purposes of "robbery" under the Hobbs Act). *See generally* Brian J. Murray, Note, *Protesters, Extortion, and Coercion: Preventing RICO From Chilling First Amendment Freedoms*, 75 Notre Dame L.Rev. 691, 704–712 (1999) (tracing extortion from the common law through the Hobbs Act and concluding that extortionate "obtaining" requires not only that a victim be deprived of property, but also that someone get the property as a result of the deprivation).

■ We also conclude that the evidence established a sufficient nexus between the conspiracy and interstate commerce. DeLuca testified that he bought auto parts for the auto shop from out-of-state suppliers "many times" and that at least one of Blitzstein's borrowers resided outside Nevada. This evidence is sufficient to establish the necessary interstate commerce connection. *See United States v. Nelson*, 137 F.3d 1094, 1102 (9th Cir.1998); *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir.1996). As we explained in *Atcheson*, even a slight impact on interstate commerce is sufficient to sustain a conviction for extortion under the Hobbs Act. *Id.*

### B. *Extortion of DeLuca*

■ Cino contends there was insufficient evidence to support his conviction for the DeLuca extortion conspiracy. Cino argues that DeLuca voluntarily agreed to give up fifty percent of his interest in the auto shop. Cino further argues there is no evidence that he ever threatened DeLuca or that DeLuca ever felt threatened by him or by the other conspirators.

Cino's arguments are unpersuasive. DeLuca testified that he understood he would exclusively own the auto shop after Blitzstein was forced out of the business. DeLuca also testified he was unhappy when Branco told him he would have to give twenty-five percent of the auto shop business to Caruso and another twenty-five percent to Panaro, but that he did not object because he "couldn't go against

them." Cino had suggested that the conspirators demand six hundred dollars a week from DeLuca. Branco and Caruso then met with DeLuca, and Branco told him that Panaro was going to ask for a portion of the proceeds from the auto shop. Branco testified that DeLuca protested, claiming there was not enough money. Branco also testified that he knew DeLuca wanted to keep the proceeds for himself. According to Branco, Cino said DeLuca would have to accede to his and Panaro's demands because DeLuca had no one else to turn to for protection. Viewing this evidence in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt that Cino and Panaro agreed to use their reputations as members of the LCN to intimidate DeLuca into giving them part of the auto shop business.

## C. *Money Laundering*

Count 27 of the indictment charged Cino with money laundering resulting from his acceptance of a $1,000 tribute payment mailed from Nevada to New York on November 2, 1996. This payment was to compensate Cino for his help in arranging a $25,000 counterfeit travelers' checks transaction. The government contends that Cino's acceptance of the $1,000 payment violated 18 U.S.C. § 1956(a)(3), which prohibits conducting or attempting to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, with the intent (1) to promote the carrying on of specified unlawful activity; (2) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or (3) to avoid a transaction reporting requirement under State or Federal law. 18 U.S.C. § 1956(a)(3). Similarly, count 33 of

the indictment charged Cino with money laundering by aiding and abetting Vincent Caci's acceptance, in California, of a $2,000 tribute payment from Nevada.

Cino argues the evidence was insufficient to support his conviction of money laundering under count 27 (the $1,000 tribute payment) because (1) the tribute payment was not intended to promote the carrying on of the counterfeit travelers' checks scheme; (2) the tribute payment was not intended to conceal the nature or source of the money; and (3) the tribute payment was not intended to avoid state or federal reporting requirements. As to count 33, (the $2,000 tribute payment), Cino argues the government failed to prove that payment was actually derived from an illegal source or that Cino knew the payment was derived from such a source. As to both counts 27 and 33, Cino argues the government failed to establish that he engaged in any financial transaction with regard to the tribute payments— such as depositing or transferring the money or using the money in some specified manner.

With regard to count 27, we are not persuaded by Cino's arguments. The $1,000 tribute payment was made to facilitate the carrying on of the underlying illegal activity. *See United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir.1996) (scheme to pay referral fees to "cappers" out of illegally obtained settlement proceeds promoted the underlying fraud because it encouraged the cappers to refer future cases). A reasonable jury could have found that the $1,000 tribute payment to Cino promoted the $25,000 counterfeit travelers' checks transaction, because without that tribute payment, Cino would not have permitted the fraudulent scheme to continue.

■ The evidence was also sufficient for a reasonable jury to find that by accepting the $1,000 tribute payment, Cino engaged in "a financial transaction involving property represented to be the proceeds of specified unlawful activity." *See* 18 U.S.C. § 1956(a)(3). A financial transaction includes a " 'transfer, delivery, or other disposition' of money." *United States v. Gough*, 152 F.3d 1172, 1173 (9th Cir.1998) (quoting 18 U.S.C. § 1956(c)(3)). Cino engaged in a financial transaction when he accepted the $1,000 tribute payment. The payment also represented "proceeds of specified unlawful activity." Branco, the coconspirator-turned-government-informant, testified that after the completion of the purchase of the $25,000 in travelers' checks, he had an obligation to give Cino "a cut." As Branco testified,

Q. Mr. Branco, with the completion of the purchase of the twenty-five thousand dollars ($25,000) in counterfeit traveler's checks, did you have any obligation toward defendant Steve Cino?

A. Yes.

Q. And what obligation did you have?

A. He would get a cut, an even cut, from—between me and the agent, and the other half—part would go to him.

Q. And why was he entitled to a cut?

A. Because he more—he put it [the transaction] together by that meeting that we had over in Palm Springs. He got it where he put us right back into being able to purchase those [traveller's checks] from that fella. . . .

To fulfill his obligation to give Cino "a cut," Branco arranged to have the $1,000 sent to Cino. In a subsequent phone call with Cino, Branco told him that he had "sent [Cino] out that news clipping"—referring to Cino's "end of the money." Cino confirmed during a phone conversation with Branco that he had received the money.

We have observed that "To establish a violation of [18 U.S.C. § 1956(a)(3)(C) ], the government need not show that the law enforcement officers explicitly stated that the cash in question was the direct product of unlawful activity." *United States v. Nelson*, 66 F.3d 1036, 1041 (9th Cir.1995). "To require government agents to be so specific would make it difficult for undercover agents to enforce § 1956(a)(3)(C), as real criminals would be unlikely to state explicitly the source of their funds." *Id.* In the present case, the evidence makes clear that Cino was receiving the $1,000 as recompense for setting up the meeting that enabled the counterfeit travelers' checks transaction to take place. Moreover, Cino wasn't just getting some amount of money, he was getting "a cut" of the proceeds from the specific scheme.

■ As to count 33, however, the evidence was not sufficient to establish that the $2,000 payment to Caci "represent[ed] the proceeds of specified unlawful activity," as required by 18 U.S.C. § 1956(a)(3).[2] The government's theory was that Cino aided and abetted the $2,000 tribute payment to Caci, and just like the $1,000 tribute payment to Cino, the $25,000 counterfeit travelers' checks scheme could not have been consummated without Caci's blessing as well as Cino's. The only evi-

---

**2.** Cino was charged in count 33 with violating 18 U.S.C. § 1956(a)(1), not 18 U.S.C. § 1956(a)(3). He argues that this mis-citation to the statute compels us to reverse his con-

viction on count 33. We do not reach this argument because we reverse the count 33 conviction on other grounds.

dence, however, that the $2,000 payment "represent[ed] the proceeds of some form of unlawful activity" was Branco's testimony that after making arrangements with Caci concerning the scheme, Branco had an obligation "to send—we owed him [Caci] anything that was going to come up"; and Branco's further testimony that thereafter he directed the undercover agent to send $2,000 to Caci for his assistance. A rational jury could not, from this evidence, find beyond a reasonable doubt that the $2,000 payment to Caci represented proceeds of specified unlawful activity.

## II.

### A. *Admission of Tape Recording*

 Cino argues the district court erred by admitting into evidence a tape recording of an October 28, 1996 conversation between Branco and Cino without requiring the government to establish the foundational requirements of authenticity required by Federal Rule of Evidence 901. Cino argues that the prejudicial effect from this tape was "insurmountable" because it was the last piece of evidence heard by the jury and because Cino was precluded from cross-examining on the contents of the tape.

 Evidence Rule 901's authenticity requirement is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). For a recording to meet the authenticity requirement, a trial court, in the exercise of its discretion, must be satisfied that the recording is "accurate, authentic, and generally trustworthy." *United States v. Mouton,* 617 F.2d 1379, 1383–84 (9th Cir.1980) (quoting *United States v. King,* 587 F.2d 956, 961 (9th Cir.1978)).

The record reflects that Cino stipulated to the following facts: (1) all the tape recordings offered by the government were intercepted pursuant to court order or consensually recorded by one of the participants to the conversation; (2) the recordings were made on or about the dates and times stated on the corresponding transcripts; (3) the recordings were made over the telephone or at the location reflected on the corresponding transcripts; (4) the recordings were accurate copies of the original recordings, except where portions were redacted; and (5) the original tapes were complete or partial recordings of the actual conversations and were not altered or otherwise tampered with in any way.

These stipulated facts are sufficient to establish the accuracy, authenticity, and general trustworthiness of the recording Cino challenges. The recording was properly admitted into evidence.

### B. *Admission of Hearsay*

 Cino argues the record is "replete with hearsay testimony" of statements made by the alleged co-conspirators. He fails, however, to identify the objectionable hearsay statements. He merely asserts that the district court "allowed the government to place before the jury prejudicial evidence of a co-defendants' [sic] statements regarding 'wacking' as well as a host of statements pertaining to alleged membership in organized crime and descriptions of violent acts having nothing to do with this case." This assertion is too general for our review of the argument Cino makes. Cino provides no specific reference to the particular statements he challenges. Accordingly, we decline to reach the merits of his argument. *See* Fed. R.App. P. 28(e) ("A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or

rejected."). In any event, we are satisfied by our review of the entire record that our refusal to consider Cino's hearsay argument will not result in any manifest injustice. *See Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988).

## III.

### A. *Role in the Offense*

■ Panaro challenges his sentence, arguing the district court erroneously found him to be an organizer or leader of the conspiracy. Based on this finding, the district court imposed a two-level increase in Panaro's offense level pursuant to USSG § 3B1.1(c) (1998).

■ "The factors to be considered when determining whether a defendant was an organizer or leader include: the exercise of decisionmaking authority, the nature of the offense and the defendant's participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, and the degree of control and authority exercised over others." *United States v. Ponce,* 51 F.3d 820, 827 (9th Cir.1995) (citing U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, cmt. n.4 (1998)). Panaro denies having exercised any decisionmaking authority or control over the other members of the conspiracy. He also denies recruiting any accomplices or having a right to a larger share in the fruits of the crime. He characterizes the conspiracy as "a conspiracy by equal partners."

Having considered Panaro's argument, we conclude the district court did not err in imposing a two-level increase in his offense level pursuant to USSG § 3B1.1(c). The record reflects that the other conspirators looked to Panaro for approval of their action. DeLuca testified that he sought Panaro's approval before going along with the plan to take over Blitz-stein's businesses because Panaro was a "made" man. DeLuca also testified that Panaro said he only answered to one person—his boss in New York. During a meeting between Panaro, Cino, and Branco on January 23, 1997, Panaro said that DeLuca should not have told Branco about the plans because DeLuca "knows he has to answer to me." The record shows that Panaro had control over DeLuca and also had some power over Branco and Caruso because of Panaro's status as a "made" man in the mafia. The district court did not clearly err by finding that Panaro was an organizer or leader.

### B. *Amount of Loss*

■ Panaro and Cino argue the district court improperly valued the amount of Blitzstein's loss. Panaro argues that "[t]he speculative nature of loansharking prohibits a finding that there was an actual or intended loss." Cino argues that he had nothing to do with the shylock loans or Blitzstein's interest in the auto shop because he was not a member of the conspiracy to extort anything from Blitzstein.

The presentence report valued the intended amount of loss related to the Blitzstein extortion to be $292,000—$45,000 representing the amount of Blitzstein's interest in the auto shop and $247,000 representing DeLuca's estimate of the outstanding shylock loans. Relying on this information, the district court applied a three-level increase in Panaro's and Cino's offense levels pursuant to USSG § 2B3.2(b)(2).

Ordinarily, the district court should use fair market value to determine loss. *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1, cmt. n.2 (1998); *United States v. Choi,* 101 F.3d 92, 93 (9th Cir.1996). However, "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the

available information." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n.2 (1998).

In this case, the district court based its valuation of the amount of Blitzstein's loss on DeLuca's estimate of the value of the auto shop business and the street value of the outstanding shylock loans. DeLuca, who was a co-owner of the auto shop and was involved in the loansharking, was in a position to estimate the value of those enterprises. Moreover, DeLuca's estimates were reasonable. The $45,000 estimate of a half interest in the auto shop was based upon his estimate that the shop netted $40,000 per year and owned equipment worth $50,000. The $247,000 estimate of the outstanding value of the shylock loans was also reasonable. While it is true that this estimate represented the full amount of the outstanding loans, without any discount for uncollectability, there is no evidence as to uncollectability in the record. We conclude the district court did not clearly err in imposing a three-level increase in Panaro's and Cino's offense levels based on the amount of the intended loss by the planned extortion of Blitzstein's business interests. And, as previously discussed, the evidence was sufficient to establish that both were members of the Blitzstein extortion conspiracy.

Cino also challenges a one-level increase in his offense level based upon what the district court found to be the value of DeLuca's half interest in the auto shop business. Cino challenges the district court's valuation of that half interest and contends DeLuca was not the victim of extortion. The record refutes Cino's arguments. The record reflects that Cino indeed was a member of the conspiracy to extort DeLuca's half interest in the auto shop, and supports the district court's valuation of that half interest at $45,000, as heretofore discussed.

C. *Threat of Bodily Injury to Blitzstein*

The district court found that the extortion of Blitzstein involved "an express or implied threat of death, bodily injury, or kidnapping" and imposed a two-level increase in Panaro's and Cino's offense levels pursuant to USSG § 2B3.2(b)(1). Panaro argues this finding was clearly erroneous because "at no time did [Panaro] approach Mr. Blitzstein nor did he participate with anyone who did approach Mr. Blitzstein, to encourage, threaten or otherwise intimidate the victim in order to obtain money or control of Mr. Blitzstein's business." Cino adds that the evidence shows that he affirmatively did not want Blitzstein harmed.

Application note 2 to § 2B3.2 provides:

This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, *such as to drive an enterprise out of business.* Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat *or the reputation of the person making it.* An ambiguous threat, such as "pay up or else," . . . ordinarily should be treated under this section.

U.S. Sentencing Guidelines Manual § 2B3.2, cmt. n.2 (1998) (emphasis added).

The record reflects that Panaro, Cino and the other conspirators repeatedly reassured DeLuca that Blitzstein would capitulate to the demand that Blitzstein relinquish his interests in the auto shop and loansharking businesses, and he would do that because of the conspirators' presence when the demand was to be made. Based on Panaro's and Cino's reputations as members of an organized crime family, the

district court did not clearly err by concluding that their plan to be present when the demand was made on Blitzstein constituted an agreement to make an implicit threat of bodily injury to Blitzstein if he refused to accede to the demand.

◼ We also conclude the district court did not clearly err by increasing Cino's offense level by three levels under USSG § 2B3.2(b)(3)(B) for his participation in a scheme which involved preparation to carry out a threat of death or serious bodily injury. The record reflects that Cino and his co-conspirators actively prepared to extort the auto shop and loansharking businesses from Blitzstein by orchestrating a show of force that would threaten him with death or serious bodily injury.

### D. Threat of Bodily Injury to DeLuca

◼ The district court also found that Cino's participation in the DeLuca extortion conspiracy involved an express or implied threat of death or bodily injury, and imposed a two-level increase pursuant to USSG § 2B3.2(b)(1). Cino argues this finding was clearly erroneous because there was no evidence that he threatened DeLuca. Cino's argument is unpersuasive. The evidence established that Cino was a member of the DeLuca extortion conspiracy, which was a conspiracy to make an implicit threat of bodily injury to DeLuca if he did not accede to the conspirators' demands.

### E. Minor Role in the Offense

◼ Cino argues the district court should have granted him a two-level downward departure for what he contends was his minor role in the offenses. See U.S. Sentencing Guidelines Manual § 3B1.2(b) (1998). We reject this argument. "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be de-

scribed as minimal." Id. at § 3B1.2, cmt. n.3. The record reflects that Cino was an equal participant in both the Blitzstein and DeLuca extortion conspiracies. Cino encouraged DeLuca to throw Blitzstein out and agreed to accept a portion of the proceeds from the extortion. Cino also agreed with Panaro to demand that DeLuca pay them money from the operation of the auto shop, pointing out that DeLuca would have no one to turn to for help. Cino was not entitled to a minor participant adjustment for his role in the offenses.

### IV.

◼ Cino argues that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), calls into question many of the sentencing enhancements imposed by the district court. We disagree.

Apprendi does not impact Cino's sentence because the sentence did not exceed the statutory maximum for his offenses. Apprendi, 120 S.Ct. at 2362–63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); United States v. Egge, 223 F.3d 1128, 1131 n. 1 (9th Cir.2000). Cino was sentenced to fifteen years imprisonment, which included his sentences for all the crimes of which he was convicted. His extortion convictions and the money laundering conviction which we affirm each carried a statutory maximum of twenty years imprisonment. See 18 U.S.C. §§ 1951(a) & 1956(a)(3).

### V.

We affirm Panaro's and Cino's convictions for conspiracy to interfere with interstate commerce by extortion in violation of

the Hobbs Act, 18 U.S.C. § 1951(a). We also affirm Panaro's sentence.

We affirm Cino's conviction on count 27, money laundering in violation of 18 U.S.C. § 1956(a)(3). We reverse Cino's conviction on count 33 for a similar money laundering violation. In view of our reversal of Cino's conviction on count 33, we vacate his sentence and remand his case to the district court for resentencing.

AFFIRMED, IN PART, REVERSED IN PART and REMANDED.